REASON WILSON, Respondent, *vs.* THE KANSAS CITY, ST. JO-
SEPH & COUNCIL BLUFFS RAILROAD COMPANY, Appellant.

1. *Texas, cattle—Transportation from one county to another, when prohibited—
Construction of statute—Measure of damages.*—Under a proper construction
of the statute relating to Texas cattle (Wagn. Stat., 251, § 1), if the cattle
have not been kept in this State during the entire previous winter, the law for-
bids their transportation from one county to another.  The prohibition is not
confined to those who ship or otherwise import the cattle into the State from
without (see § 9 as amended by act of March 21st, 1873, Sess. Acts, 1873, p. 72).
Nor is the liability of the person, so transporting them, limited to the dam-
ages resulting from disease communicated by them while under his control or
caused by his want of proper care.  The statute makes him liable for all dam-
ages, direct or remote, caused by his wrongful introduction of the stock into
a county and without regard to the question of negligence or caution.  (The
opinion of the court did not contemplate a case of damage growing out of the
subsequent introduction of the stock into another county, and by another and
independent owner.)
2. *Practice, civil—Instructions—When refusal of proper.*—It is not error to re-
fuse an instruction, when those given fairly present the law of the case and
are not calculated to mislead.
3. *U. S. Constitution—Texas Cattle Act no attempt to regulate inter-state com-
merce.*—The statute relating to Texas cattle (Wagn. Stat., p. 251 § 1), is not
in violation of the provision of the U. S. Constitution (Art. I, § 8), giving
Congress power to regulate commerce among the several States, etc., by reason
of the fact that it prohibits the introduction of all Texas cattle during certain
seasons of the year.  That measure was a necessary police regulation, to pre-
vent the introduction of a contagious and dangerous disease, and in no proper
sense an attempt to regulate inter-state commerce, although it might inci-
dentally in some slight degree have an effect upon it.

*Appeal from Nodaway Circuit Court.*

*Willard P. Hall*, for Appellant.

I. The Texas cattle act does not prohibit the transportation
of that stock from one county within this State to another.

II. The owner of the cattle who turned them out upon the
prairie, and not the railroad, caused the damage, and he alone
is liable.  (Wagn. Stat., §§ 134–136 *et seq ;* also, § 139.)

III. The Texas cattle statute is highly penal and must be
strictly construed.  (56 Mo., 407.)

IV. It is violative of the power given Congress by the Con-
stitution of the United States to regulate commerce between

the States. (Gibbons vs. Ogden, 9 Wheat., 186 ; Graves vs. Slaughter, 15 Pet. 511 ; 7 How. 393.) The State police power to exclude disease, gives the legislature no power to prohibit the introduction of cattle which are not diseased or infected—which it does prohibit by this law; for it makes no discrimination, but excludes them all.

*Johnson & Jackson* with *C. A. Anthony,* for Respondent.

I. The defendant violated the law in taking the cattle from one county to another, and was responsible for all damages following. (Sedgw. Dam., 5 Ed., s. p. 88, s. pp. 79–80 ; Murphy v. Wilson, 44 Mo., 313, and cases referred to ; Baxter v. Roberts, 13 Am. Law Reg., 16. 41 ; 1 Am. Lead. Cas., 549 ; 19 Johns., 381 ; 4 Denio, 464.) The Missouri statute is similar to the Vermont law. (Sedg. Dam., p. 88, n. 2 ; Saxton v. Bacon, 31 Vt., 541.) It is also like the Massachusetts statute (Perley v. Eastern R. R. Co., 98 Mass., 414).

The law is a necessary police regulation; (11 Pet., 102, 139 ; 17 Mo., 13–15 ; Cool. Const. Law, 573, 2 Ed.) and under the U. S. Constitution is left to the several States. (Cool. Const. Law, 574 ; 8 How., 632, 592 ; 36 Ind., 389 ; 10 Am. Rep., 42–51 ; 44 Mo., 523 ; 16 Pet., 539 ; 58 Ill., 254 ; 44 Ill., 523 ; 26 Mo., 441 ; Pierce Am. R. R. Law, 40, 6 Ed. of 1867.)

VORIES, Judge, delivered the opinion of the court.

This action was brought under the provisions of the statutes of this State, concerning Texas, Mexican and Indian cattle.

The petition, after charging that the defendant was a corporation, etc., proceeded to state, in substance, that the defendant did, on the — day of May, 1873, transport, convey and bring into said county of Nodaway, against the form of the statutes in such case made and provided, (referring to the particular statutes) a great number of Texas, Mexican and Indian cattle, to-wit : one hundred head ; that said cattle had not been kept the entire previous winter in this State ; that said Texas, Mexican and Indian cattle brought among and communicated to a large number of native cattle a certain disease,

very fatal to said native cattle, known as the Texas or Spanish fever; that said disease was communicated by said Texas, Mexican and Indian cattle, to forty-three head of native cattle, the property of the plaintiff; that a large portion of said cattle of plaintiff died from said disease so communicated, and the remainder were lessened in value; in consequence of all which, plaintiff was damaged in the sum of one thousand dollars, for which judgment is prayed.

The defendant answered denying each allegation of the petition.

The issues were tried by a jury.

The defendant objected to the introduction of any evidence in the case, for the reason that the petition did not state facts sufficient to constitute a cause of action against the defendant. The objection was overruled and the defendant excepted.

One Addison Case, a witness on the part of the plaintiff, testified that in May, 1873, he resided at Maryville, Nodaway county. His business was the shipping of cattle; that about the 20th of May, 1873, he contracted with the Missouri, Kansas and Texas Railroad Company at the town of Chetopa, in the State of Kansas, about two miles from the southern boundary of the State of Kansas, to ship five car loads of cattle; that he shipped 149 head of cattle over said road to Kansas City, in the State of Missouri, at that time; that he afterwards sold the same cattle to Scott and Snively who lived in Nodaway county, Missouri; that the cattle were shipped over the Missouri, Kansas and Texas Railroad to Fort Scott, and from there, on the Missouri River, Fort Scott and Gulf Railroad, to Kansas City, and there delivered to witness by the last named railroad company; that they were then shipped from Kansas City, Missouri, to Maryville, in Nodaway county, Missouri, by the Kansas City, St. Joseph and Council Bluffs Railroad Company, over their road to Maryville, in Nodaway county, and there delivered to said witness; that the cattle came the whole distance from Chetopa to Kansas City in the same cars; that the same cattle were then shipped to Nodaway county, as aforesaid, by defendant,

and were unloaded at Maryville, in said county, and there de-
livered to witness about the 24th day of May, 1873 ; that the
defendant had no further control of said cattle after they were
unloaded and delivered to witness as aforesaid ; that the agents
of the defendant when the cattle were received and placed on
defendant's cars at Kansas City knew upon what train and road
the cattle had been brought to Kansas City, and that there
were back charges due on the cattle for freight ; that witness
continued to own said cattle for two weeks after they were de-
livered to him at Maryville, and that they were herded on the
102 river bottom just east of Maryville and near the de-
pot, where they were delivered, for a considerable time.

The plaintiff introduced other witnesses whose testimony
tended to prove that defendant had delivered the cattle, before
spoken of, to Case on or about the 24th day of May, 1873,
from its train of cars ; that the cattle were Texas cattle ; that
said cattle were herded just east of and near to the depot,
where they had been unloaded, for some weeks after their ar-
rival at the depot ; that they herded on the bottom lands
west of the river 102 ; that plaintiff at the time that these
Texas cattle were delivered at the depot at Maryville, was the
owner of a herd or drove of cattle of what are called the na-
tive breed ; that his cattle had been, and were then running
and grazing on the bottom prairie land along the west side of
the river 102, at the same place where the cattle of Case were
herded ; that some two months after the cattle belonging to
Case had been brought to Maryville, and herded as before
stated, a large number of plaintiff's cattle became sick with a
peculiar disease, and many of them died, and others were in-
jured and damaged ; that other cattle that were in the vicin-
ity of where the Case cattle were herded in the county were
also afflicted apparently with the same disease with which
plaintiff's cattle died, and many of them also died.  The evi-
dence of witnesses who had seen cattle, at various times, suf-
fering from what is called Texas or Mexican fever, tended to
prove that plaintiff's cattle had died of said fever and that the
disease had been communicated to said cattle as well as others

in the same vicinity, by the cattle of Case, shipped there by defendant.

The evidence also tended to prove that plaintiff was damaged by the disease thus communicated to his cattle in a sum sufficient to justify the damages found and recovered.

The defendant offered no evidence. At the close of the evidence the court, at the request of the plaintiffs, instructed the jury as follows.

1. "If the jury believe from the evidence that the defendant by its agents, servants or employees, conveyed into the county of Nodaway, in the State of Missouri, between the 1st day of March, 1873, and the first day of November in said year, and about the time mentioned in plaintiff's petition, any Texas, Mexican or Indian cattle, and caused the same to remain in said county of Nodaway by unloading the same from its cars, and they further believe that said Texas, Mexican or Indian cattle communicated a disease, known as Texas or Spanish fever, to the cattle of plaintiff, or any of them, by which they died, or were injured, then they will find for the plaintiff, unless they further find from the evidence that such Texas, Mexican or Indian cattle had been kept within the State of Missouri the entire previous winter of 1872 and 1873."

2. "Whether the defendant conveyed any Texas, Mexican or Indian cattle into Nodaway county and unshipped them, and whether such cattle communicated the disease called 'Texas fever' to plaintiff's cattle, and whether they died of such disease, and whether said cattle were conveyed or brought into the State, or into said county between the first day of March and 1st day of November, 1873, are all questions for the jury to determine from the whole evidence, and it devolves upon the plaintiff to prove to the satisfaction of the jury, by a preponderance of the evidence, that the defendant conveyed such cattle into this State and unshipped them here, and that the plaintiff's cattle died of the disease known as Spanish or Texas fever, communicated to the cattle, by the cattle so shipped by defendant. And if you find that plaintiff's cattle died of such disease communicated to them by such Texas cattle,

Wilson v. Kas. C., St. Jo. & Council Bluffs R. R. Co.

the fact is *prima facie* evidence that such cattle were in the State in violation of the law, and it would devolve upon the defendants to show that said cattle have not been conveyed into this State between the 1st day of March, and the first day of November, 1873, or have been wintered the whole of the previous winter in this State."

3. "If the jury find for the plaintiff they will estimate his damages at the reasonable value of the cattle that died of said disease, less any profit realized from those that died, together with such sum as you may believe from the evidence plaintiff has sustained by injury to other cattle affected by said disease which did not die, and the reasonable expenses and value of his time in caring for and endeavoring to cure said cattle."

The defendant at the time objected to the foregoing instructions. Its objections being overruled it excepted.

The court gave the jury two instructions prayed for by the defendant, the first of which is substantially identical with the 3rd instruction given for the plaintiff. The second reads as follows:

"The jury cannot presume that from the mere fact of plaintiff's cattle sickening and dying, they did so from the effects of what is known as Texas fever; but you must believe from the evidence that the disease of which they sickened and died was in fact Spanish or Texas fever, so called, and that said disease was brought about and communicated, or caused to be communicated to plaintiff's cattle by said Texas, Mexican or Indian cattle so shipped or brought into the county by the defendant, between 1st day of March and the first day of November, 1873."

The defendant also asked the court to give the jury several other instructions which were refused by the court and exceptions saved.

The first of these refused instructions is as follows: "It devolves upon the plaintiff to prove that the Texas, Mexican or Indian cattle, mentioned in his petition, were conveyed into this State, as well as into Nodaway county, by defendant

and that they had not been wintered the entire previous winter in this State, and unless the jury so believe, they will find for the defendant."

The other instructions asked by the defendant and which were refused by the court told the jury in effect that if the disease with which plaintiff's cattle died, was not communicated to them by said Texas cattle while they were being transported into Nodaway county by defendant, or while they were in the cars or cattle pens of defendant and under its control, then, defendant would not be liable to plaintiff for any damages sustained by him in consequence of said disease having been communicated to plaintiff's cattle, and that in such case they should find for the defendant.

The jury found for the plaintiff and assessed his damages at $——.

The defendant in due time filed its motions in arrest of judgment and for a new trial, which were severally overruled by the court, and final judgment rendered, when the defendant saved its several exceptions and appealed to this court.

I apprehend that the material questions involved in this case depended upon the proper construction to be given to the statute relating to the bringing into this State of Texas, Mexican or Indian cattle at certain prohibited periods of the year. (1 Wagn. Stat., p. 251.)

The first section of the act referred to is as follows, to-wit: "No Texas, Mexican or Indian cattle shall be driven or otherwise conveyed into or remain in any county in this State between the 1st day of March and the first day of November in each year, by any person whatsoever; *Provided*, That nothing in this section shall apply to any cattle which have been kept the entire previous winter in this State; *Provided further*, That when such cattle shall come across the line of this State, loaded upon a railroad car or steamboat, and shall pass through this State without being unloaded, such shall not be construed as prohibited by this act; but the railroad company or owners of a steamboat performing such transportation shall be responsible for all damages which may result from the dis-

ease called the Spanish or Texas fever, should the same occur along the line of such transportation ; and the existence of such disease along such road shall be *prima facie* evidence that such disease has been communicated by such transportation."

The second and third sections of said statute provide for the arrest and punishment of persons who have driven or otherwise conveyed into a county any of the prohibited cattle in violation of the first section, etc.

The ninth section of the statute provides a remedy in favor of persons injured by a violation of the statute. It is as follows: "If any person or persons shall bring into this State any Texas, Mexican, or Indian cattle, in violation of the first section of this act, he or they shall be liable, in all cases for all damages sustained on account of disease communicated by said cattle."

By an act of the legislature of this State, approved March 21st, 1873, and which took effect from its passage, the ninth section above set forth was amended, which amendatory act reads as follows: "Section 1st. Section nine of an act entitled 'An act to prevent the introduction into this State of Texas, Mexican or Indian cattle during certain seasons of the year, approved February 26th, 1869,' is hereby amended so as to read as follows: Sec. 9. If any person or persons shall bring into this State, or shall drive or otherwise convey into or cause to remain in any county in this State, any Texas, Mexican or Indian cattle, in violation of the first section of this act, he or they shall be liable in all cases, for all damages sustained on account of disease communicated by said cattle ; and the fact that disease has been communicated by any Texas, Mexican or Indian cattle, shall be *prima facie* evidence that said cattle are in this State in violation of the first section of this act."

It is insisted by the defendant that the court erred in giving the jury the instructions given at the request of the plaintiff, that the act under which the action is brought only

prohibits the importation into this State from another State, but does not prohibit the transportation of Texas or Indian cattle from one county of the State to another, or from one part of the State to another. I do not think that the construction given by the defendant is the proper construction to be given to the act referred to. The first section of the act provides that none of the prohibited cattle shall be driven or otherwise conveyed into any county in this State between the first day of March and the first day of November of each year, unless such cattle shall have been kept the entire previous winter in this State. It makes no difference where the cattle start from, whether in this State or another State, under this clause of the section. If the cattle have not been kept in this State for the entire previous winter, the driving or conveying of them into another county in this State is prohibited. Suppose that a person should ship Texas cattle into some of the southern counties of this State in the month of February. The shipping into the State would not be unlawful and such cattle might be permitted to remain in the State without the violation of any law, up to the last day of February, but if they were permitted to remain in this State until after the first day of March such remaining after the first of March would be a clear violation of the law. We will suppose that the owner of the cattle in place of removing such cattle out of the State before the first of March, leaves the southern part of the State on the last day of February and conveys said cattle to Nodaway county where he arrived with the cattle some time in March. Would it be pretended that he could not be prosecuted under this act for conveying the cattle into Nodaway county after the first day of March? If the construction given to the statute by the defendant is correct, the people of Nodaway county would have no remedy under the statute no matter how much disease was communicated to their cattle by the Texas cattle thus driven or conveyed into the county, for at the time the cattle came into the State it was not unlawful to bring them, and in fact, the cattle had not been brought into the State between the 1st of March and November.

It is further provided by the same section that cattle may come across the line of the State in cars or steamboats and pass across the State without being unloaded; but even in that case the owners of the cars or steamboat are made liable for all damages occasioned by the communication of disease by said cattle to the cattle of other persons along the line of travel.

By the language used in the second section of the act, it further appears that the prohibition of the law was not intended to be confined to those who shipped or otherwise conveyed cattle from without the State into the State. Said section provides that: "Whenever complaint shall be made in writing upon the oath of any one competent to testify, and filed with any justice of the peace in this State, that any person or persons have driven or otherwise conveyed into the county where such justice resides, any Texan, Mexican, or Indian cattle, or has under his or their control any such cattle, contrary to the first section of this act, it shall be the duty of such justice of the peace to issue his warrant for the arrest of such person," etc. It will be seen that the complaint authorized under this section is not required to state that the cattle have been brought to this State by the party prosecuted; but that the accused had conveyed them into the county where the justice resides.

It is true that the ninth section of the act, as it stood before it was amended by the act of 1873, only furnished a remedy in damages in favor of the parties injured against persons violating the first section of the act, in cases where the cattle had been brought into the State during the prohibited periods. It is evident that the omission in the ninth section to furnish a remedy in favor of parties injured, against persons who had unlawfully driven or otherwise conveyed the prohibited cattle into any county of the State, regardless of the point from which the cattle were started, was that which led to the amendment of said section by the act of 1873. The amendatory act clearly recognizes the two distinct offences and provides for each. It provides that "If any person or persons shall bring into this State, or *shall* drive or otherwise convey into or cause to remain *in any county in this*

13—VOL. LX.

*State,"* etc. This clearly recognizes two different acts, each amounting to an offence, the first to transport cattle of the prohibited class into this State; and the second, to drive or otherwise convey said cattle into any county in this State. When the statute is all considered together it seems clear that an offence may be committed by conveying cattle from one part of this State into a different county in the State.

In construing this act we cannot shut our eyes to the history of this State and the surrounding facts and circumstances at the time, which led to the enactment of the statute of 1869. There had been considerable commotion created in some parts of the State growing out of the driving or shipment by cattle dealers, who were dealing in Texas or Mexican cattle, in large numbers into certain portions of this State. The Texas fever had been communicated to large numbers of the cattle and was destroying almost entire herds of cattle belonging to the citizens where the Texas cattle were permitted to roam.

In some places the citizens were threatening the destruction of the Texas cattle thus brought into their neighborhood, and they were generally demanding some kind of relief. It frequently happened that after the cattle in one community had been infected with disease, and the people there had become inimical to those who had control of the Texas cattle, the owners, or those having control of said cattle, would move their cattle into a different part of the State, and into some prairie county where there was an abundance of grass, and there infect the native cattle with the disease. To prevent this changing from county to county and infecting the cattle with disease throughout the whole country, was one of the principal objects of the statute of 1869; and it was to provide a civil remedy to parties injured in such cases that the amendatory act of 1873 was adopted.

It is next insisted by the defendant, that the defendant if liable for the transporting of Texas or Mexican cattle during the prohibited season into Nodaway county, would only be liable for damages resulting from disease communicated to the cattle of others while the prohibited cattle were in its pos-

session or under its control ; that after the railroad company had parted with the control of the cattle by delivery thereof to the owner, it could not be held liable for damages resulting from the conduct of others; "that the consequences of such a doctrine would be, that capital would be obliged to bear the burden, not merely of its own want of caution, but of the want of caution of everybody else. If an injury occurred through negligence, the chain of effects will be traced back until a capitalist is reached, and he, being thus made the cause, would be liable for all the subsequent negligence of others on the same subject."

It seems to me that the position of the defendant above taken, and the foregoing quotation made by it from " Wharton's Law of Negligence" to sustain said position, are both foreign to the question involved in this case. This case is wholly governed by the statute under which the action is brought. There is no question of caution or negligence on the part of the defendant involved in the case. Nor is it material whether the damages were the direct or remote consequence of the illegal act of the defendant, provided the facts bring the cause within the provisions of the statute. The greatest amount of caution and care on the part of the defendant while transporting the cattle could do the plaintiff no good. The statute has made it unlawful to convey Texas cattle into any county in this State between certain periods of each year, and the same statute fixes the consequences of its violation. The consequences provided by the statute are that in addition to fine and imprisonment which may be inflicted, " that he or they shall be liable in all cases, for all damages sustained on account of disease communicated by any Texas, Mexican or Indian cattle ; and the fact that disease has been communicated by any Texas, Mexican or Indian cattle, shall be *prima facie* evidence that said cattle are in this State in violation of the first section of this act."

It would be impossible to use language that would make this statute more general and comprehensive. The statute ignores all questions as to caution or negligence on the part of

one who has violated its provisions, and makes the guilty parties liable for all damages sustained in consequence of disease communicated by the cattle wrongfully brought into the county. If the cattle should afterwards be driven or otherwise conveyed from the county into which the defendant had conveyed them, by their owner or others wholly unconnected with defendant, into another and different county in the State, this would be a new and distinct violation of the statute, and the question as to who and who only would be liable for damages suffered by the citizens of the last named county, would admit of altogether different considerations; but that question is not before us in this case.

We are reminded that this statute is highly penal in its consequences, and ought, therefore, to be strictly construed. It is true that penal laws are generally strictly construed; but this statute is remedial as well as penal and should not be so strictly construed as to defeat one of the most obvious objects of its creation. It is also true that this statute may, in some cases operate rather harshly on individuals who may be engaged in conveying cattle from one place to another in this State; but the evil intended to be remedied was at the time threatening the destruction of one of the leading industries of this State. The remedy provided was intended to be effectual. The court properly refused the instruction asked on the part of the defendant and which is complained of. The instructions given to the jury by the court when all taken together fairly presented the law of the case to the jury and were not calculated to mislead.

It is next insisted by the defendant that the statute under which this action was brought is in violation of that provision of the constitution of the United States which provides "that Congress shall have power to regulate commerce with foreign nations and among the several States and Indian Tribes" and that consequently said act is wholly void. It is insisted that the act not only prohibits the introduction of diseased cattle into this State, which it is conceded may be done, but that it prohibits the importation of all cattle in the act

designated whether they are or are not diseased. It is assumed by the Legislature in the act in question, that all Texas or Mexican cattle are liable, at certain seasons of the year, to communicate disease to, and among the native cattle of the State, when brought to this State during the prohibited season. In fact it was known to be the usual and natural result, that when such cattle were brought into this State at the prohibited season, the Texas or Mexican fever followed them whereever they went. Under such circumstances it was not only inconvenient but impossible to select or pick out the particular animals in a herd which were capable of propagating said disease. On the contrary, it was, and is, believed to be dangerous to the safety of our native cattle to permit any Texas or Mexican cattle to be brought into the State during the prohibited season of the year, whatever their apparent health might be. It therefore became necessary to prohibit the introduction of all Texas or Mexican cattle into this State at certain seasons of the year or to abandon the breeding of native cattle by the citizens of this State. The Legislature under such circumstances, assumed, and had a right to assume, that it would endanger the property of the citizens of the State to permit the prohibited cattle to enter the State at certain seasons of the year.

The right of a State to enact such police regulations as are necessary to protect her citizens from contagious and dangerous diseases, and to protect their property from calamity or destruction cannot be denied. Such regulations by a State are in no sense an attempt to regulate commerce among the States. Such police powers were never delegated to Congress; and, indeed, could not be, without a total surrender on the part of a State of the power to protect or preserve her own citizens. Congress is not to be looked to by the citizens of a State for such police regulations as will protect themselves and their property from disease and consequent destruction. These police regulations reside in the legislative power of the State, and their exercise is not in conflict with the provision of the constitution referred to. And it makes

no difference that such regulations when adopted by the State for such a purpose should incidentally, in some slight degree affect the commerce carried on between citizens of different States. (Lewis vs. Boffinger, 19 Mo., 13 ; City of St. Louis vs. McCoy, 18 Mo., 238.)

It would be a useless labor for me to attempt to examine and comment upon the different cases referred to by the attorneys for the respective parties in this case. The identical question involved in this case has been, on several occasions, brought before the Supreme Court of the State of Illinois, growing out of the construction of a statute of that State prohibiting the introduction of the same class of cattle into that State. It has been uniformly held by that court that the law of said State substantially like the law under consideration was not in conflict with the constitution of the United States; but that the same was simply a proper exercise of the police power vested in the State for the preservation of her own citizens. The last time that the question was brought before the Supreme Court of Illinois was on the 16th of January, 1875 in the case of the Chicago and Alton Railroad Co. vs. Gassaway. (Chicago Legal News for January, 1875, p. 147.) Scholfield, justice, delivering the opinion in that case remarks: "The constitutionality of the 'act to prevent the importation of Texas or Cherokee cattle into the State of Illinois, approved February 27th, 1867' was affirmed in Yeazel vs. Alexander, 55 Ill., 255 ; Stevens vs. Brown, *Id.*, 289 ; Somerville vs. Monks, *Id.*, 371 ; and it has been recognized in numerous subsequent cases. Since, therefore, there is nothing in the amendment to the act approved April 16th, 1869, under which the action arose to which the reasoning in those cases is not applicable it cannot be profitable to consume further time in the discussion of the question thus settled."

We concur in the views of the Supreme Court of Illinois in believing that the statute is simply a proper police regulation on the part of the State, and is not to be construed as. conflicting with the constitution of the United States.

Read v. St. Louis, Kas. C. & Northern R. R. Co.

There were some other questions raised and saved in the Circuit Court during the trial of the case; but they have not been insisted on in this court and will not be discussed here. The judgment will be affirmed; the other judges concur.