C. F. FURLEY AND S. A. STEIN v. THE CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Appellant.

Transporting Infected Cattle into Iowa: LIABILITY NOT ABSOLUTE. Bringing a cow which is transferred to a common carrier from a connecting line, into the state, which cow is one originally shipped from Iowa into the south and reshipped to Iowa, and which has Texas fever when brought back here, does not make the common carrier absolutely liable for damages to those injured by the importation, under Code, section 4058, as amended by Acts, Twenty-first General Assembly, chapter 156, and such injury makes a *prima facie* case of liability, only, which may be rebutted by showing that the railway company was free from negligence. ROBINSON, J., *dissenting;* KINNE, J., taking no part.

*Appeal from Tama District Court.*—HON. L. G. KINNE, Judge.

WEDNESDAY, JANUARY 31, 1894.

ACTION to recover damages for the loss of certain cattle which, it is alleged, died from the disease called "Texas fever," which disease was contracted by con-

tact with a cow which the defendant unlawfully transported into this state from the state of Illinois.    There was a trial by jury, and a verdict and judgment for the plaintiffs.    Defendant appeals.—*Reversed.*

*Mills & Keeler* for appellant.

*Struble & Stiger* for appellees.

ROTHROCK, J.—It appears from the record that on June 22, 1890, one Nathan L. Brown shipped from Long Beach, on the Gulf of Mexico, six miles east of Pass Christian, in the state of Mississippi, a car load of emigrant movables, consisting of household goods, a horse, and a cow, to a station on defendant's road at Elberon, Tama county, in this state.    Brown accompanied the car, and remained in charge of its contents, throughout the journey.    The car was billed through from the starting point to its destination, and it was transported over connecting lines until it reached Port Byron Junction, in the state of Illinois, where it was delivered to the defendant, to be forwarded over defendant's road to its destination.    When the car arrived at Elberon, which was about June 27, 1890, Brown unloaded and took away his property.    He turned the cow into a pasture with plaintiffs' cattle, and it is claimed by the plaintiffs that their cattle contracted the disease known as "Texas fever" from said cow, and that by reason thereof about thirty-two of plaintiffs' cattle died.    The defendant filed an answer in two counts.    The plaintiffs demurred to the second count of the answer.    The court sustained the demurrer. The trial proceeded upon the petition and the first count in the answer.    The main contention on the trial, after the demurrer was sustained, appears to have been on the question whether the plaintiffs' cattle died from Texas fever by contagion from the said cow owned by Brown, or from some other disease.

It is conceded by counsel for the respective parties that the principal question on this appeal is whether the demurrer to the second count of the answer was rightly sustained. We will, therefore, proceed to a consideration of that question. The defendant, in the second count of the answer, admits that it received the car at Port Byron Junction in the state of Illinois, with a waybill of said car and contents, and that said cow and other property were shipped from Long Beach, near Pass Christian, Mississippi. The defensive part of the answer is as follows: "And defendant further avers that at no time while said car and stock were so in its possession or under its control, whether in transit or otherwise, did it have any knowledge or information whatever, of any nature or degree, that said cow was in such condition as to infect with or to communicate Texas fever to other cattle, or to plaintiffs' cattle; that, if such cow was then in that condition, such fact was utterly unknown to this defendant, and could not have been discovered by it with the means then at its command, or in the exercise of such care on its part as was required by law, under the circumstances; that this defendant exercised all due care and caution on its part, and had neither knowledge nor means of knowledge that said cow, when so brought within the state of Iowa, or when delivered at Elberon, was diseased, or was in such condition as to infect with or to communicate to other cattle Texas fever, as alleged in plaintiffs' petition, and it was not negligent in that respect." There were several paragraphs in the demurrer, separately numbered; but there was really only one ground upon which it was claimed that the answer was vulnerable to the demurrer. It is clearly stated in the seventh paragraph, which is as follows: "The statute of Iowa expressly prohibited any person from bringing into this state cattle in such a condition as to infect with or to communicate Texas

fever to other cattle.   Defendant, in the said second
count of its answer, admits, by implication, the viola-
tion of this statute, but pleads, as a defense and excuse,
that it acted in ignorance and without information as
to the condition of the animal in question; and the
admission of the defendant that it violated the law of
this state is not excused by an allegation of want of
knowledge or information, nor that it acted in violation
of law in ignorance of its provisions, and exercised
care in the premises." It will be observed that the
demurrer is as broad as the answer, and the question
presented is, is the defendant absolutely liable to the
plaintiffs, notwithstanding the fact that its agents and
employees had no knowledge or information of the con-
dition of the cow, and that the said condition could
not have been discovered by the exercise of proper
care and caution, and that the defendant was not neg-
ligent in receiving the car, and transporting its contents
to their destination. The ruling on the demurrer pre-
cluded the defendant from showing that it exercised all
proper care and caution, and was not chargeable with
negligence; and the charge to the jury was to the effect
that if the cow was, at the time of shipment, in such
condition as to infect with or communicate Texas fever
to other cattle, and did communicate the disease to
plaintiffs' cattle, from which disease they, or some of
them, died, the defendant was absolutely liable for
damages.

The question is to be determined by the construc-
tion placed on chapter 156 of the Acts of the Twenty-
first General Assembly, which is amendatory to, or
rather substituted for, sections 4058 and 4059 of the
Code. The second section of the act, which is desig-
nated as section 4058, prohibits any person or corpora-
tion from importing any cattle into this state which, at
the time of such importation, are in such condition as
to infect with or communicate to other cattle pleuro-

pneumonia, or splenic or Texas fever. It makes the violation of the law a misdemeanor, and visits the offender with a fine of not less than three hundred dollars and not more than one thousand dollars, or by both fine and imprisonment in the county jail not exceeding six months, in the discretion of the court. The third section of the act is as follows: "Any person who shall be injured or damaged by any of the acts of the persons named in section 4058, and which are prohibited by such section, in addition to the remedy therein provided, may bring an action at law against any such persons, agents, employees or corporation mentioned therein, and recover the actual damages sustained by the person or persons so injured, and neither said criminal proceeding nor said civil action shall in any stage of the same be a bar to a conviction or to a recovery in the other. This statutory provision does not appear to us to be essentially different, so far as the rule of liability thereunder is involved, from that part of section of 1289 of the Code which was under consideration by this court in the case of *Small v. Railway Co.*, 50 Iowa, 338. That provision is as follows: "Any corporation operating a railway shall be liable for all damages by fire that is set out or caused by operating of any such railway, and such damage may be recovered by the party damaged in the same manner as set forth in this section in regard to stock, except as to double damages." It was held in the case above cited, that this does not create an absolute liability, but makes the fact of an injury so occurring only *prima facie* evidence of negligence, which may be rebutted by a showing of freedom from negligence. It is true that the decision in that case was made by a divided court; but the rule of the majority has since been followed in very many cases. See *Slosson v. Railway Co.*, 51 Iowa, 294, 1 N. W. Rep. 543; *Libby v. Railway Co.*, 52 Iowa, 92, 2 N. W. Rep.

982; *Babcock v. Railway Co.*, 62 Iowa, 593, 13 N. W. Rep. 740 and 17 N. W. Rep. 909; *Rose v. Railway Co.*, 72 Iowa, 625, 34 N. W. Rep. 450; *Seska v. Railway Co.*, 77 Iowa, 137, 41 N. W. 596; *Engle v. Railway Co.*, 77 Iowa, 661, 37 N. W. Rep. 6, and 42 N. W. 512; *Greenfield v. Railway Co.*, 83 Iowa, 270, 49 N. W. Rep. 95. And since the decision was made in *Small's case* there have been six regular sessions of the general assembly, and we are not aware that at any time there has been any proposition introduced looking to an amendment of this statute, so as to make the liability for setting out fires absolute. Under such circumstances, it would be an amazing departure from a long line of decisions to hold that the construction adopted in *Small's case* is not the settled law of this state, as expressed by this court, and as enacted by the lawmaking power. As we have said, the statute declaring liability for setting out fires, so far as the question of its absoluteness is involved, is not different from the statute applicable to this case. We need not here set them out side by side. They are assentially the same, as will appear by any fair examination of their provisions. It is provided by a statute of the state of Kansas as follows: "That no person or persons shall drive or cause to be driven into or through any county in this state, any cattle diseased with the disease known as Texas, splenic, or Spanish fever. Any person violating any provision of this act shall on conviction be adjudged guilty of a misdemeanor, and shall be fined not less than one hundred and not more than one thousand dollars, and be imprisoned in the county jail not less than thirty days and not more than one year." Another section of the same act is as follows: "Any person or persons who shall drive or cause to be driven into or through any county in this state any of the cattle mentioned in section one of this act, in violation of this act, shall be liable to the party injured for all

damages that may arise from the communication of disease from the cattle so driven to be recovered in civil action, and the party so injured shall have a lien upon the cattle so driven." In the case of *Patee v. Adams*, 37 Kan. 133, 14 Pac. Rep. 505, it was held that in an action to recover damages under this statute it was essential for the plaintiff to allege and prove that the defendant knew, or had reason to know, that the cattle so driven were diseased with the fever, or were liable to communicate the disease to the domestic cattle of the state. It will be observed that the statute involved in that case is not essentially different from our own. They both declare a liability in general terms, without any language importing an absolute liability. The cited case goes much further than *Small's case*, or than we do in the case at bar, and holds that the burden of proof of knowledge or negligence is on the plaintiff. *Patee v. Adams, supra*, was followed and approved in *Railway Co. v. Finley*, 38 Kan. 350, 16 Pac. Rep. 951. Counsel for appellee admit that the cited cases involve the same question which we are considering. It is to be conceded that a contrary rule has been adopted in the state of Missouri. See *Wilson v. Railway Co.*, 60 Mo. 184, and *Surface v. Railway Co.*, 63 Mo. 452. In our opinion, the rule of the Kansas cases is in line with the better principle.

But it is claimed by counsel for appellee that the question has, in effect, been determined by this court; and we are cited to the cases of *Jamison v. Burton*, 43 Iowa, 282; *Dudley v. Saulbine*, 40 Iowa, 650; *State v. Thompson*, 74 Iowa, 119, 37 N. W. Rep. 104; and *State v. Cloughly*, 73 Iowa, 626, 35 N. W. Rep. 652. These and other cases which have been decided by this court are mainly prosecutions for violations of the prohibitory liquor law of this state by selling beer to minors and inebriates, and it is held that want of knowledge of the age or habits of the purchaser is no

defense. The principle upon which the cases rest is that the avocation of the vendor of intoxicating liquors is unlawful, except under certain circumstances, and that, when he sells, he assumes the burden of knowing that these circumstances exist, and sells his liquor at his peril. It is a general rule that mere ignorance of fact will not excuse a person from a penalty provided by statute. 3 Greenleaf on Evidence, section 21. But that principle can have no application to one who, in the pursuit of a lawful calling, and in the exercise of proper care and caution, does an act contrary to some statutory requirement. The theory of appellee is that defendant committed a criminal act, the violation of which is punishable by fine and imprisonment, and that, as it could make no successful defense to a criminal prosecution, it is absolutely liable for the damages occasioned by the criminal act. This is not an absolute rule. The law is well settled that, when a railroad train is operated through a city at a rate of speed prohibited by law or ordinance under a penalty, there is no absolute liability to a person injured by reason of the violation of the law or ordinance. It may, in such case, be shown that the person injured contributed to cause the injury by his own negligence. The application of the principle contended for to the facts of this case, it appears to us, shows conclusively that the defendant should have the right to prove, if it can, that it was free from negligence in receiving and transporting the car over its road. There is no hardship to plaintiffs in adopting this rule. The case is exceptional in its facts. It was not an ordinary shipment of live stock, which would put the employers on inquiry as to whether the animals were such as come within the provisions of the statute. The cow was not bred in the south. The owner of the property was a resident of this state. In the fall of the year previous to the shipment complained of, Brown went to Long

Beach to remain during the winter. He shipped his cow, with certain household goods, to that place, and the alleged cause of action arose when he reshipped the property to this state in the spring following. There was nothing in the appearance of the cow indicating that she had any disease. The fact appears to be that she was not diseased. She was milked during all the time she was in the south, and after she was returned to this state, and the milk was used by Brown's family. In the autumn of the following year she was fattened and slaughtered, and her flesh was used for food. There is evidence, however, to the effect that an animal acclimated in the south, and removed to this state, may communicate the Texas fever to cattle here without showing any evidence of the disease itself. In view of this claim, and in consideration of the fact that the defendant, as a common carrier, is bound to receive and transport freight offered for shipment, it would be unjust and unreasonable to require that it be absolutely liable to pay all damages arising by reason of the carrying of animals that may communicate contagious diseases, without allowing it to be shown that the carrier had no notice, and could not, by the use of reasonable care, have ascertained, that the animal belonged to the class, the transportation of which is forbidden by the statute. We think the statute under consideration does not impose any such absolute liability. The business of a common carrier is not only lawful, but it is absolutely essential as an agency in the transaction of the business interests and commercial affairs of the country. Under the facts of this case, the claim of appellee, in the face of the facts pleaded in the answer, is that the defendant was bound at its peril, before receiving the car, to ascertain that the animal was not in such condition as to communicate the disease to other cattle. Under the law of this state and the act of congress known as the "Interstate

Commerce Law," the defendant was bound to receive freight in car lots, and haul it to its destination. McClain's Code, section 2039; U. S. Stat. 1885-87, page 379. And the nature of the freight in this case was such that the defendant was bound to act promptly. It was liable to an action for damages, if it failed to so act. The contention of plaintiff is that there is a liability to fine and imprisonment and damages for receiving and hauling the car. Suppose that the defendant was a natural person, and should be indicted, and he should offer to prove the facts set up in this answer; we think there ought to be no question that it would be a great error to reject the evidence, and hold the defendant guilty of a crime, and imprison him in a county jail for six months, and fine him one thousand dollars. There is nothing in either the letter or the spirit of the statute which would sanction any such proceeding. The case is essentially different from those arising upon such police regulations as are enacted for the purpose of regulating dramshops, gambling houses, and the smuggling of goods, and the like. Counsel for appellee, in their argument in this court, say that, if the construction of the statute which we have adopted is to prevail, "it will at once become a dead letter, and may as well be repealed." We think the fears of counsel are groundless. As we have said, the case at bar is exceptional in its facts. We hold that the defendant should be allowed to show that it was blameless, if it can make such a showing. The rule in the *Small case* left that statute in full force, and recovery has been had under that law in a large number of cases, as the reports of the decisions of this court will show. The judgment of the district court is REVERSED.

KINNE, J., took no part in the decision of this case.

ROBINSON, J. (*dissenting*).—I do not agree to what is said in the foregoing opinion in regard to the

effect of chapter 156 of the Acts of the Twenty-First General Assembly. Section 4058 of the Code, as amended by that act, provides as follows: "* * * Any railway company * * * who shall carry, ship or deliver any cattle into this state * * * which, at the time they were * * * brought, shipped or transported into this state were in such condition as to infect with or to communicate to other cattle, pleuro-pneumonia, or splenetic or Texas fever, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than three hundred dollars, and not more than one thousand dollars, or by both fine and imprisonment in the county jail not exceeding six months. * * *". In my opinion, the offense for which that section provides is one of the class referred to in 3 Greenleaf on Evidence, section 21, in the following language: "Where a statute commands that an act be done or omitted which, in the absence of such statute, might have been done without culpability, ignorance of the fact or state of things contemplated by the statute, it seems, will not excuse its violation. Thus, for example, when the law enacts the forfeiture of a ship having smuggled goods on board, and such goods are secreted on board by some of the crew, the owner and officers being alike innocently ignorant of the fact, yet the forfeiture is incurred, notwithstanding their ignorance. Such is also the case in regard to many other fiscal, police and other laws and regulations, for the mere violation of which, irrespective of the motives or knowledge of the party, certain penalties are enacted; for the law, in these cases, seems to bind the party to know the facts and to obey the law at his peril." In *Commonwealth v. Raymond*, 97 Mass. 568, it is said to be the general rule, where acts which are not evil in themselves are prohibited by law from motives of public policy, and not because of their moral turpitude

or the criminal intent with which they are committed, that persons are bound to know the facts and obey the law at their peril.   That doctrine I understand to be fully sustained by the authorities.   Thus, in 1 Wharton on Criminal Law, section 88, it is said: "When a statute makes an act indictable irrespective of guilty knowledge, then ignorance of fact, no matter how sincere, is no defense.   * * *   The function of imposing indictability on pernicious acts, irrespective of intent, is one which has been exercised by legislatures, not only frequently, but from necessity.   * * *   The question is one of policy; and this may be taken into consideration when the legislative meaning is sought. That a man should be convicted of a malicious act without proof of malice, or of a negligent act without proof of negligence, is of course an enormity which no legislature could be supposed to direct.   But it is otherwise as to certain mischievous acts, which it may be a sound policy to prohibit arbitrarily, because they imperil public safety (as, for example, the selling of intoxicating drinks, and defective storing of explosive compounds), and because to require scienter to be proved would be to defeat the object of the statutes, since in many cases, and those the most dangerous of the class, it would be out of the power of the prosecution to prove *scienter* beyond reasonable doubt.   * * *" The doctrine of the statements quoted is illustrated by the citation of numerous cases where persons were adjudged guilty of crimes by innocently doing acts which they believed, and had good reason to believe, were lawful; and the conclusion of the author is that honest ignorance of a fact may be no more of a defense than honest ignorance of a law, and that honest belief that an illegal act is legal is not necessarily a defense in a criminal prosecution.   See, also, *State v. Hartfiel*, 24 Wis. 60; 4 Am. and Eng. Encyclopedia of Law, 689. The doctrine of the authorities cited was approved in

the recent case of *Commonwealth v. Weiss*, 139 Pa. St. 247, 21 Atl. Rep. 10. A legislative enactment of that state, known as the "Oleomargarine Act," provided that "no person, firm or corporate body shall manufacture out of any oleaginous substance or any compound of the same, other than that produced from unadulterated milk or cream from the same, any article designed to take the place of butter or cheese produced from pure unadulterated milk, or cream from the same, or of any imitations or adulterated butter or cheese, nor shall sell or offer for sale, or have in his, her or their possession with intent to sell the same as an article of food." The act also provided that every person who should manufacture, sell, or offer or expose for sale, or have in his possession with intent to sell, any substance, the manufacture and sale of which is prohibited by the provision quoted, should for every such offense forfeit and pay the sum of one hundred dollars. The action named was commenced against the keeper of a restaurant to recover the statutory penalty for a violation of the law. It appeared that he had served a customer with oleomargarine, contrary to the provisions of the act specified, but that he did not knowingly furnish, or authorize to be furnished, to any of his customers, any oleomargarine, but so far as he knew, furnished genuine butter. In considering his guilt, the court said: "Whether a criminal intent or a guilty knowledge is a necessary ingredient of a statutory offense is a matter of construction.

"It is for the legislature to determine whether the public injury threatened in any particular matter is such, and so great, as to justify an absolute and indiscriminate prohibition, even if, in the honest prosecution of any particular trade or business, conducted for the manufacture of articles of food, the product is healthful and nutritious; yet, if the opportunities for fraud and adulteration are such as to threaten the pub-

lic health, it is undoubtedly in the power of the legislature either to punish those who knowingly traffic in the fraudulent article, or, by a sweeping provision to that effect, to prohibit the manufacture and sale altogether. The question for us to decide, therefore, is whether or not, from the language of the statute, and in view of the manifest purpose and design of the same, the legislature intended that the legality or illegality of the sale should depend upon the ignorance or knowledge of the party charged. The statute in question was the exercise of the police power, and the act was sustained upon this ground, not only in this court, but also in the supreme court of the United States. * * * The prohibition is absolute and general; it could not be expressed in terms more explicit and comprehensive. The statutory definition of the offense embraces no word implying that the forbidden act shall be done knowingly or willfully, and, if it did, the design and purpose of the act would be practically defeated. The intention of the legislature is plain— that persons engaged in the traffic shall engage in it at their peril, and that they can not set up their ignorance of the nature and qualities of the commodities they sell as a defense."

The rule of the authorities cited has been frequently recognized by this court. In *State v. Probasco*, 62 Iowa, 401, 17 N. W. Rep. 607, it was held that if a minor was permitted to remain in a billiard saloon, in violation of the statute, the offense prescribed by the statute was committed, even though the keeper of the saloon did not know of the presence of the minor. See, also, *State v. Thompson*, 74 Iowa, 122, 37 N. W. Rep. 104. The same rule has been applied in cases involving acts wrong in themselves. Thus, in *State v. Newton*, 44 Iowa, 45, it was held that a person who made an assault on a female under the age of ten years for a purpose forbidden by section 3861 of the Code was guilty of

a violation of section 3873, even though he did not know that the child was under that age. It was said that the crime did not depend upon the knowledge of defendant of the fact that the child was under ten years of age, but upon the fact itself. The case of *State v. Ruhl*, 8 Iowa, 449, announces a similar doctrine, and it is supported by numerous decisions in civil cases. In *Dudley v. Sautbine*, 49 Iowa, 650, it was held that, where the agent of the owner of a saloon sold intoxicating liquor to a person who was in the habit of becoming intoxicated in violation of law, his principal was liable, although the liquor was sold without his knowledge, and in violation of instructions he had given. See, also, *Church v. Higham*, 44 Iowa, 482. Where a person had the right to sell intoxicating liquor to some persons, but was prohibited from selling to a minor, he was guilty of a violation of the law in selling to a minor although he did not know that the purchaser had not attained his majority, and had good reason to suppose that he had. *Jamison v. Burton*, 43 Iowa, 282. If a person set fire to and burn, or cause to be burned, any prairie or timber land, and allow such fire to escape his control, between the first day of September in any year and the first day of May following, he is absolutely liable for damages which result, and his liability is not affected by the degree of diligence he used to prevent the escape of the fire. *Conn v. May*, 36 Iowa, 241; *Thoburn v. Campbell*, 80 Iowa, 340, 45 N. W. Rep. 769.

Section 4059 of the Code, as amended by chapter 156 of the Acts of the Twenty-first General Assembly, provides that "any person who shall be injured or damaged by any of the acts of the persons named in section 4058, and which are prohibited by such section, in addition to the remedy therein provided, may bring an action at law against any such persons, agents, employees or corporations mentioned therein, and recover the actual damages sustained by the person or persons

so injured, and neither said criminal proceeding nor said civil action, in any stage of the same, shall be a bar to a conviction or to a recovery in the other." This section authorizes a recovery for damages which were caused by any of the acts prohibited by the preceding section.    It follows that if they may be committed without knowledge of the condition of the cattle, although reasonable care had been exercised to ascertain it, and without an evil intent, persons injured by them may recover damages caused thereby, without regard to the knowledge or intent of the persons who committed them, and without regard to the diligence they used to avoid them. The right of recovery extends to all acts causing damage which are made criminal by the statute.    Section 4058 is in the nature of a police regulation.    In *Railway Co. v. Husen*, 95 U. S. 465, it was admitted that, in the exercise of its police powers, a state may enact laws for the protection of property within its borders, and to that end may exclude animals having contagious or infectious diseases; and the same doctrine has been announced in other cases and is well settled.

It is said, however, that the statute under consideration, so far as the rule of liability thereunder is involved is not essentially different from that construed in *Small v. Railway Co.*, 50 Iowa, 338, and that the doctrine of that case should be applied in this.    It does not seem to me that there is anything to justify the presumption that the general assembly intended to incorporate the doctrine of the *Small case* in its revision of sections 4058 and 4059 of the Code.    The originals of those sections were enacted by the twelfth general assembly in the year 1868, and were incorporated, in a modified form, in the Code of 1873, nearly six years before the opinion in the *Small case* was filed.    Both the act of 1868 and the Code made it unlawful for any one to

bring into the state Texas cattle, and provided for the recovery of damages by persons injured by violations of the law, and contained nothing to indicate that such violations would depend upon the knowledge or negligence of the person who should bring the cattle into the state. In that respect those statutes were in legal effect, the same as the act of the twenty-first general assembly. An additional reason for concluding that the general assembly did not intend to adopt, in the act of 1886, the construction placed upon section 1289 in the *Small case*, is the fact that the opinion in that case was founded almost wholly upon considerations which have no application to the act under consideration. The portion of section 1289 construed in the *Small case* is as follows: "Any corporation operating a railway shall be liable for all damages by fire that is set out or caused by operating of any such railway, and such damage may be recovered by the party damaged in the same manner as set forth in this section in regard to stock." The court said: "The first clause of the provision might seem to create an absolute liability. It makes the company liable for all fires caused by the operating of its road. If this provision stood alone, it would go far to support the plaintiff's construction (that the liability created is absolute, not depending on the negligence of defendant), although it would not necessarily sustain it, as we will hereafter endeavor to show." The court concluded that the liability was not absolute, for the reasons, *first*, that the first clause was coupled with a provision which provided for the manner of recovery; *second*, that when a fire occurs in the legitimate use of railway property, without fault in the mode of use, and simply by the intervention of an uncontrollable element of nature, the cause of the fire is to be referred to the element, and not to the use; *third*, that in paying the damages for its right of way the railway company compensates the property owner for

the dangers to which his property is exposed by operating the railway; *fourth*, that the statute was of doubtful construction, and it was, therefore, proper to give some weight to what might be considered as demanded or forbidden by the public interest; *fifth*, that contributory negligence of the property owner would defeat recovery when the corporation was in fault, and should also defeat it when the corporation was not in fault. It seems to me apparent that the first, second and third grounds of the opinion, as I have stated them, do not exist in this case. The language used in the statute of 1886 is not doubtful, but direct and clear, and the policy of the statute is not a matter for judicial consideration. The conclusion of the opinion, that the corporation is not liable when the property owner is guilty of contributory negligence, is contrary to the rule adopted by this court in *West v. Railway Co.*, 77 Iowa, 654, 35 N. W. Rep. 479, and 42 N. W. Rep. 512, and other cases. Whether the decision in the *Small case* is correct is, it seems to me, a question which is not involved in this case, and which there is no occasion to determine.

The Kansas cases cited in the opinion of the majority rest in part upon a statute enacted after the one which was directly involved, but upon the same subject, which provided that, when the cattle which communicated the disease were brought into the state from a place south of the thirty-seventh parallel of north latitude, that fact should be taken as *prima facie* evidence that the cattle were capable of communicating, and liable to impart, the disease, and that the owner or person in charge of the cattle had full knowledge and notice thereof. Our statutes contain no provision of that kind. It is said the principle stated in 3 Greenleaf on Evidence, section 21, "can have no application to one who, in the pursuit of a lawful calling, and in the exercise of proper care and caution, does an

act contrary to some statutory requirement." So far as that statement refers to acts which are prohibited by statutes, without regard to the knowledge or intent with which they are committed, and especially those in the nature of police regulations, it seems to me to be contrary to the authorities, including decisions of this court, and not to be well founded in reason. It is well settled that honest ignorance of the law will not excuse its violation, and in many cases it is as reasonable and as consistent with a due regard to liberty and property to provide that honest ignorance of a fact shall not excuse a violation of a law which is demanded by public policy.

The oleomargarine act of Pennsylvania does not prohibit the acts therein contemplated in terms any more direct and positive than does the statute under consideration, and the language used by the supreme court of that state which I have quoted is, in the main, applicable in this case. The statutory definition of the offense charged against defendant "embraces no word implying that the forbidden act shall be done knowingly or willfully, and, if it did, the design and purpose of the act would be practically defeated." The general assembly intended to protect the large and growing cattle interests of this state from the danger to which they would be exposed if cattle in the condition specified in the act should be brought into the state. It was for the general assembly to determine whether that danger, and the interests threatened, were "so great as to justify an absolute and indiscriminate prohibition." If a railway corporation may excuse its act in bringing into this state prohibited cattle on the ground that it did not know their condition, and could not, with ordinary and reasonable care, have ascertained it, then it seems to me evident that the statute must fail to accomplish its purpose to a great extent, if not wholly; and that is especially true if the corporation may be required to receive such

cattle, and deliver them to the consignee within this state, without regard to their condition; and I understand the opinion of the majority to hold, in effect, that when a loaded car, although containing prohibited animals, is tendered to such corporation, it is its duty to receive and forward it, and to act promptly in doing so, and that such duty may forbid such a delay as would be required to ascertain their condition. That it is necessary to so hold to sustain the opinion appears from the fact that, if the mere conclusions set out in the portion of the answer demurred to are disregarded, no effort whatever on the part of the defendant to ascertain the condition of the cow is shown. The theory of the answer seems to be that as the defendant had no actual knowledge of the condition of the cow, and could not have ascertained it readily by inquiry, it would not have been justified in delaying to receive and forward the car until it could ascertain the fact. If that is the law (and under the rule of the majority opinion it seems to be), the cases in which railway corporations bringing prohibited cattle into this state can not show lack of knowledge must be few; for such cattle will ordinarily be received from other railways, loaded in cars, and forming part, or all, of full car loads, and the obligation to receive and forward them without delay will be as pressing as it was in this case. It is said that the objection that, under the construction adopted by the majority, the statute will have little, if any, effect, is groundless, and the result of the decision in the *Small case* is cited in support of that statement. But the character of the cases contemplated by section 1289 of the Code is wholly unlike those for which the statute under consideration provides. When property is destroyed by fire from a locomotive engine, the circumstances attending its destruction are, or may become, fully known to the owner, and proof of them is readily obtainable. For that reason he may be able

to overcome the *prima facie* showing of the railway
company that its engines were in good order, and that
it was free from negligence in setting the fires. But to
rebut proof of care, and want of knowledge, on the
part of the company in cases arising under the statute
in controversy, the person injured would be compelled
to seek evidence of a kind difficult, if not impossible, to
ascertain, beyond the limits of the state and in unknown
quarters, and practically he would be in the power of
the company. I do not think that a railway company
can be compelled to receive and bring into this state,
without delay, freight in car lots which includes prohib-
ited cattle. The act prohibiting them is valid, and,
so long as it stands, its violation is not required by any
act of congress or of the general assembly.

The hardship involved in holding the defendant
liable if it could not, with reasonable diligence, have
discovered the actual condition of the cow, is evident,
and might well be considered by the general assembly
in determining whether criminal liability should be
incurred in such cases; but, so long as the statute
creates the liability, the courts should not interfere to
defeat the legislative purpose. That hardship and
apparent injustice sometimes result from the enforce-
ment of criminal statutes is inevitable; but that is not
a sufficient reason for not enforcing them, nor for
adopting a rule of construction which may do justice
in exceptional cases, but which will tend to defeat it in
others. In this case it would not be a greater hardship
to require defendant to pay the damages which its act
in bringing the cow into the state caused than it is for
the plaintiff to sustain it without compensation, and,
if both parties are equally free from negligence or
intentional wrong, there would be an element of jus-
tice frequently recognized by the courts in compelling
the one whose act caused the loss to bear it. That the
statute in question was intended to create an absolute

liability for the bringing into the state of prohibited cattle, without regard to the knowledge or intent with which it was done, is further shown by the general course of procedure in regard to criminal statutes which was pursued by the general assembly which enacted it.  That body passed seventeen acts which were of a criminal character, or contained penal provisions.  Two of them—chapter 66 of the Acts of the Twenty-First General Assembly, relating to the sale of intoxicating liquors, and chapter 83, relating to the practice of pharmacy—related to subjects upon which it is admitted the general assembly may properly legislate, creating liability for prohibited acts without regard to the knowledge with which they are committed, and need not be considered.  Of the remaining fifteen, chapter 30, relating to embezzlement; chapter 63, relating to fish dams; chapter 76, relating to foreign corporations; chapter 78, relating to the funding of indebtedness of certain cities; chapter 79, prohibiting traffic in hogs which died of disease; chapter 104, regulating the practice of medicine; chapter 117, relating to mortgaged personal property; chapter 148, providing for a custodian of public buildings; chapter 161, in regard to elections; and chapter 177, relating to obscene literature,—contained provisions of a penal nature, without in terms making knowledge or intent an element of the act prohibited; but in each case the act is of such a nature as necessarily to involve knowledge, or negligence in not obtaining it.  Chapter 52, relating to imitation of butter and cheese; chapter 65, relating to mutual benefit associations; chapter 165, relating to the sale and transfer of grain; and chapter 174, to prevent fraud in canned food,—create offenses which may, for convenience, be divided into two classes:  *First.*  Those which involve the doing of an act prohibited, or the omission of an act commanded, where knowledge that the act or omission is unlawful

exists from the nature of the case, unless there has been negligence to obtain it; and, in those cases, words requiring knowledge as an element of the offense are not used in the statute. *Second*. Those acts or omissions which are prohibited, [but which are not made criminal, unless the act or omission is with knowledge that it is unlawful; and in the definitions of those offenses—some eight or more in all—the word "knowingly" is used in each case. Thus, section 2 of chapter 52 makes it a misdemeanor for any person who manufactures imitation butter or cheese to omit to mark it in the manner prescribed in the act. It is not said that the manufacturer must know of the omission in order to commit the offense, but it is within his power to know and prevent it. The next four sections provide for various offenses, but make knowledge a necessary element of each of them, in terms which can not be misunderstood. Thus, section 3 provides that "no carrier shall knowingly receive for the purpose of forwarding or transporting any imitation butter or imitation cheese," unless it shall be marked and consigned in the manner prescribed. Section 8 makes the possession or control of imitation butter or cheese, not marked as required by the act, presumptive evidence of knowledge on the part of the person having such possession or control. Chapter 156 is the only one of the seventeen Acts of the Twenty-First General Assembly referred to, if chapter 66 be excepted, which prohibits an act which may be committed in honest ignorance that it is forbidden, without, in terms, making knowledge that it was forbidden necessary to a conviction. The general assembly was careful to provide that a carrier should not be liable to a fine of not more than one hundred dollars, nor to imprisonment not exceeding thirty days, for receiving imitation butter or cheese not properly marked and consigned, unless it was done with knowledge of the fact. The omission to provide

that the acts prohibited by the statute under consideration must be done with knowledge to create the heavier criminal liability, civil liability, in view of the rule followed in other cases, is most significant. It seems to me the omission can have but one explanation, and that is that in enacting chapter 156 the general assembly designed to make the prohibited act penal, and to create an absolute liability, without regard to the knowledge of the party committing it. The facts in this case tend strongly to justify the general assembly in adopting stringent measures to keep out of the state cattle in the condition described in the statute. The bringing into the state of one cow resulted in the death of thirty-two cattle owned by the plaintiff. If shipments into the state of cattle in condition to communicate to other cattle the disease contemplated by the statute were numerous, the loss which such shipments might cause to the cattle industries of the state is beyond computation. That fact was known to the general assembly when the statute was enacted, and no doubt was felt to be a sufficient justification of the severe provisions which it contains. It seems to me that the interpretation of the statute adopted in the opinion of the majority is contrary to the legislative intent, and that its practical effect will be to defeat the legislative will.